**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| HARISH C. GROVER | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CLASS ACTION |
| ARBINET-THEXCHANGE, INC., | : | |
| J. CURT HOCKEMEIER, JOHN J. | : | |
| ROBERTS, MERRILL LYNCH & | : | |
| CO., LEHMAN BROTHERS, | : | |
| SG COWEN & CO., WILLIAM | : | |
| BLAIR & CO. and ADVANCED | : | JURY TRIAL DEMANDED |
| EQUITIES INC. | : | |
| | : | |
| Defendants. | : | |

**CLASS ACTION COMPLAINT**

**SUMMARY OF CLAIMS**

1.      This securities class action is brought on behalf of the purchasers of Arbinet-Thexchange, Inc. ("Arbinet" or the "Company") common stock, who purchased their shares pursuant or traceable to Arbinet's December 16, 2004 initial public offering ("IPO" or the "Offering") (the "Class").  Plaintiff brings this action against Arbinet, certain of its officers and directors, and the co-lead underwriters of the IPO for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o.  Plaintiff and the Class seek to recover damages resulting from their purchases of Arbinet common stock, which was marketed and sold to the investing public at an inflated price by means of a materially false and misleading Registration Statement and Prospectus (collectively, the "Registration Statement").

2.      In December 2004 Arbinet and certain selling shareholders offered 6.5 million shares of common stock in the IPO pursuant to the Registration Statement, 4.23 million shares of common stock to be sold by Arbinet and 2.3 million shares of common stock to be sold by the selling stockholders.  The IPO was priced at $17.50 per share resulting in

proceeds of $68.9 million to Arbinet and $37.4 million to the selling shareholders, after underwriting discounts and commissions. Plaintiff purchased Arbinet common stock pursuant, or traceable, to the Registration Statement, which was declared effective on December 16, 2004.

3.    The Registration Statement contained materially false and misleading statements of fact, omitted material facts and failed to disclose material facts necessary to make the  statements made not misleading, as alleged below. In sum, the Registration Statement failed to disclose and misrepresented principal factors which drive Arbinet's revenues and profits, including, *inter alia*: (a) the material fact that increases in wireless calls would decrease Arbinet's revenues and profits because wireless calls, on the average, are of shorter duration than wired calls and, therefore, generate less revenue and profits for Arbinet because Arbinet's fees are based primarily on numbers of minutes used; (b) the material fact that because certain geographic markets are characterized by shorter-duration calls and, therefore, generate lower fees, shifts in the geographic market usage mix will decrease revenues and profits; (c) the material fact that the growth in the number of calls completed is not the true indicator of Arbinet's revenues and profits because it the duration of the call completed, that is the number of minutes per call rather than the number of calls completed, that determines the fees Arbinet receives; (d) the material fact that the exchange lacked a sufficient liquidity "floor" to insure that there would be a sufficient number of buyers and that, as a result, Arbinet's revenues would be reduced by substantial price incentives Arbinet would offer in order to generate fee revenue; (e) the material fact that Arbinet's revenues would be materially adversely impacted if one or two of its larger customers experienced credit worthiness problems and reduced their trading, despite Arbinet's intensive credit risk management programs; (f) the material fact that Arbinet's business model for providing wholesale capacity, particularly in providing international voice capacity, is not significantly different from its competitors, including

2

iBasic, and that as result, Arbinet will not be able to keep pace with the growth in the international wholesale market; and (g) the material fact that Arbinet did not have the lowest cost termination rates to a significant number of calling destinations in the international wholesale market and, therefore, would lose traffic to lower cost competitors and suffer reduced growth rates.

4.      As Arbinet, now a public company, was required to report its quarterly earnings, these material facts, misrepresented in or omitted from the Registration Statement, became known to the public.  On May 5, 2005, the price of Arbinet stock dropped almost 25% when the Company announced the material facts causing its first quarter 2005 results to be greatly reduced.  Subsequently on June 22, 2005, the price of Arbinet stock dropped another 35% when the Company disclosed additional material facts that would cause its second quarter 2005 revenues and profits, again, to be greatly reduced.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b).

7.      Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.  Many of the acts and transactions giving rise to the violations of the federal securities laws complained of herein, including the preparation and dissemination to the investing public of materially false and misleading statements, occurred in substantial part in this District.  In addition, the Company maintains its executive offices in this District and the Individual Defendants and/or witnesses transact business and/or reside in this District.

8.     In connection with the conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

9.     Plaintiff Grover purchased shares of Arbinet common stock pursuant to the Registration Statement filed in connection with the IPO, and was damaged thereby.

10.    Defendant Arbinet maintains its corporate headquarters in News Brunswick, New Jersey.  Arbinet's stock actively trades on the NASDAQ market system under the symbol "ARBX."  Arbinet is the leading electronic market for trading, routing and settling communications capacity.  As of September 30, 2004, Arbinet had 343 members who subscribed to voice trading services, including eight of the world's ten largest communications service providers.  Members of Arbinet's exchange anonymously buy and sell voice calls and internet capacity through its centralized efficient and liquid market place.  Arbinet provides an efficient alternative to direct individual negotiations and purchasers of access to the networks of other communication service providers to send voice calls and internet capacity outside their network.  Buyers enter orders based on route quality and price and are matched to sell orders by Arbinet's fully automated trading platform and its priority software.  When a buyer's order is matched to a seller's order, the voice calls or internet capacity are then routed through Arbinet's state of the art facilities.  Arbinet invoices and processes payments for its members' transactions and manages the credit risk of buyers through its credit management programs with third parties.  Arbinet generates revenues from both the trading which members conduct on its exchange, which is referred to as trading revenues, and the fees it charges members for the ability to trade on its exchange, which is referred to as fee revenues.  Trading revenues represent the

aggregate dollar value of the calls which are routed through Arbinet switches at the price agreed to by the buyer and seller of the capacity.

11.    Defendant J. Curt Hockemeier has been a director since April 2000 and the President and Chief Executive Officer since August 2000.  From April 2000 to August 2000 he served as Arbinet's President and Chief Operating Officer.  For calendar years 2003 and 2004, Hockemeier received a salary of $400,000, a bonus of $75,000, and other compensation valued in excess of $50,000.    Hockemeier signed the Registration Statement.

12.    Defendant John J. Roberts has been the Company's Chief Financial Officer since April 2004.  Previously from March 2003 to April 2004 he served on various private consulting roles.  From April 2000 through February 2003 he was a chief financial officer of Razorfish Inc.  Defendant Roberts entered into a letter agreement with Arbinet whereby he receives an annual base salary for 2004 of $250,000 subject to an annual increase upon review by the Board of Directors.  Roberts is eligible for a bonus based upon the achievement of assigned performance goals and subject to the approval of the Board of Directors.  Roberts signed the Registration Statement.

13.    Defendant Merrill Lynch & Co. ("Merrill"), is one of the world's leading financial management and advisory companies which has three core businesses–global private client, global markets and investment banking group and Merrill Lynch Investment Managers.  As a known investment bank, the company is a leading global underwriter of debt and equity securities and strategic advisor to corporations, government, institutions and individuals worldwide.  Merrill was facilitating internet distribution for the Arbinet IPO as well as the co-manager of the IPO.

14.    Defendant Lehman Brothers ("Lehman"), is engaged in the investment banking private investment management asset management and private equity business with headquarters in New York.  Lehman was one of the co-managers of the IPO.

15.     Defendant SG Cowen & Co. ("Cowen"), offers investment banking services equity research and raises capital for its clients.  Cowen is based in New York.  Cowen served as one of the underwriters of the IPO.

16.     Defendant William Blair & Co., L.L.C. ("Blair"), is a Chicago based investment firm which was one of the underwriters of the IPO and received compensation from the Company for its investment banking services.

17.     Defendant Advanced Equities Inc. ("Advanced Equities"), is a full service broker-dealer in adventure capital investment bank with offices in Chicago, Illinois.  Advanced Equities was one of the underwriters of the IPO. It invests in companies to fill the void between private venture capital investors and an initial public offering.  In connection therewith, Advanced Equities currently holds a warrant to purchase shares of Arbinet Series E preferred stock and as affiliate of Advanced Equities, Inc. served as placement agent in connection with the issuance in 2001 of Arbinet Series E preferred stock.  This affiliate received customary fees and commissions of this transaction.

18.     For the purposes of this Complaint, defendants Merrill Lynch, Lehman, Cowen, Blair and Advanced Equities will be referred to as the "Underwriter Defendants." Each of these firms helped orchestrate the IPO, including drafting registration statement, selling the shares to the public and/or conducting the necessary due diligence for the offering.

19.     The Underwriter Defendants assisted Arbinet in planning the  IPO, purportedly conducting an investigation into the business, operations, products and future business prospects of Arbinet, known as a "due diligence" investigation, which was required of them in order to participate in the Offering.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Arbinet's business, financial condition, products and future business plans and prospects.  In addition to availing themselves of virtually unbridled

6

access to internal corporate documents, the Underwriter Defendants also communicated with Arbinet management.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Arbinet, the Underwriter Defendants should have known of Arbinet's existing financial and manufacturing problems.

20.    As a consequence of their investigation and communications with Arbinet, the Underwriter Defendants (or their agents or counsel) met with representatives of Arbinet and counsel during the several weeks prior to the issuance of the Registration Statement for the IPO.  During such meetings, including those known as "drafting sessions," representatives of the participants met to discuss the timing in terms of the Offering and the contents of the Registration Statement, and devised, agreed upon and refined the actions necessary for the consummation of the IPO.  These parties discussed and reached understandings as to the timing and strategy to best accomplish the IPO, the terms of the IPO, the language to be used in the Prospectus, what disclosures about Arbinet would be made in the Registration Statement, and what responses would be made to the SEC in connection with its review of the Registration Statement.  The Underwriter Defendants thereafter caused the Registration Statement to be delivered to potential and actual purchasers of Arbinet common stock in connection with the Offering.

21.    As a result of constant contacts and communications between the Underwriter Defendants' representatives and Arbinet and their access to the negative and adverse internal documents and reports of the Company's actual business performance, the Underwriter Defendants should have known that those public statements were misleading when made and had the effect of inflating the price of Arbinet's common stock.

## CLASS ACTION ALLEGATIONS

22    Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on behalf of a class consisting of all persons who purchased Arbinet common stock in or traceable to the IPO (the "Class"). Excluded from the Class are Defendants,

members of the immediate family of each of the Individual Defendants, officers and/or directors of the corporate Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

23.     The Class is so numerous that joinder of all members is impracticable. Approximately 6.5 million shares of Arbinet common stock were offered pursuant to the IPO.  It is believed that hundreds, if not thousands, of investors purchased Arbinet common stock pursuant or traceable to the Registration Statement, rendering joinder of all such purchasers impracticable.

24.     The names and addresses of the record owners of Arbinet common stock purchased pursuant to the IPO are available from the Company's transfer agent(s).  Notice can be provided to such record owners via first class mail using techniques and a form of notice similar to those customarily used in class actions.

25.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages as a result of the wrongful conduct complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the members of the Class that Plaintiff seeks to represent.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged.

28.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely effecting individual members of the Class.  Among the questions of law and fact common to the Class include whether:

(a)     Defendants violated Sections 11 and 15 of the Securities Act, as alleged herein;

(b)     the Registration Statement contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)     the price of Arbinet common stock in the IPO was artificially inflated due to the non-disclosures and misstatements complained of herein; and

(d)     the members of the Class have sustained damages and, if so, the appropriate measure thereof.

29.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FALSE AND MISLEADING STATEMENTS

30.     Arbinet's Registration Statement is required to present the material facts concerning Arbinet's business and financial condition, as well as the relevant risk factors. Arbinet's Registration Statement purported to fulfill those legal requirements by including sections titled "Summary," "Risks Relating to Our Business," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business."  The statements made by defendants in the Registration Statement and particularly the highlighted sections were false and misleading when made because they did not accurately and fully set forth the material facts which were negatively impacting and would continue to negatively impact the business revenues and profits of Arbinet.  Specifically, defendants failed to disclose and misrepresented:

9

(a)     the material fact that increases in wireless calls would decrease Arbinet's revenues and profits because wireless calls, on the average, are of shorter duration than wired calls and, therefore, generate less revenue and profits for Arbinet because Arbinet's fees are based primarily on numbers of minutes used;

(b)   the material fact that because certain geographic markets are characterized by shorter-duration calls and, therefore, generate lower fees, shifts in the geographic market usage mix will decrease revenues and profits;

(c)     the material fact that the growth in the number of calls completed is not the true indicator of Arbinet's revenues and profits because it the duration of the call completed, that is the number of minutes per call rather than the number of calls completed, that determines the fees Arbinet receives;

(d)     the material fact that the exchange lacked a sufficient liquidity "floor" to insure that there would be a sufficient number of buyers and that, as a result, Arbinet's revenues would be reduced by substantial price incentives Arbinet would offer in order to generate fee revenue;

(e)     the material fact that Arbinet's revenues would be materially adversely impacted if one or two of its larger customers experienced credit worthiness problems and reduced their trading, despite Arbinet's intensive credit risk management programs;

(f)     the material fact that Arbinet's business model for providing wholesale capacity, particularly in providing international voice capacity, is not significantly different from its competitors, including iBasic, and that as result, Arbinet will not be able to keep pace with the growth in the  in the international wholesale market; and

(g)     the material fact that Arbinet did not have the lowest cost termination rates to a significant number of calling destinations in the international wholesale market and, therefore, would lose traffic to lower cost competitors and suffer reduced growth rates.

31.     In numerous places throughout the Registration Statement, defendants made the following false and misleading statements and set forth the following facts.  These statements were false and misleading because they omitted the material facts alleged in paragraph 30, hereof, which were necessary to make the statements made in the Registration Statement truthful:

(a)     We...manage the credit risk of buyers primarily through our credit risk management programs with third parties." (pages 1, 32, 47 in the Registration Statement);

(b)     "Our exchange has achieved increased liquidity, as we have continued to add new members and experience growth in the number of minutes of wireline and wireless voice calls traded on our exchange...; [we have a] centralized, efficient and liquid marketplace." (pages 1,32, 47 in the Registration Statement);

(c)     In the first nine months of 2004, 39% of the wireline/wireless mix of minutes traded on our exchange was wireless and 61% was wireline compared to 37% and 63%, respectively in the full year 2003. (pages 2, 47 in the Registration Statement);

(d)     "We have grown, and believe we will be able to continue to grow, fee revenues significantly faster than...operating costs and expenses." (pages 2, 34 in the Registration Statement);

(e)     "We...manage the credit risk of transactions executed on our exchange through third-party financing arrangements, prepayment programs, cash deposits and letters of credit.  This enables us to pay our sellers regardless of whether we have collected payment from the buyers." (pages 2-3 in the Registration Statement);

(f)     "By demonstrating the cost savings of our exchange to senior management of our members, we believe members will increase their participation on our exchange." (pages 3, 51 in the Registration Statement);

      (g)    "As our membership increases, we expect the network effect of our exchange to attract even more buyers and sellers, which will further increase liquidity." (pages 4, 52 in the Registration Statement);

      (h)    "To remain profitable, we must continue to increase the usage of our exchange by our members and attract new members in order to improve the liquidity of our exchange." (page 4 in the Registration Statement);

      (i)    "We have incurred a cumulative loss since inception and if we do not maintain or generate significant revenues, we may not remain profitable...A large portion of our fee revenues is derived from fees that we charge our members on a per-minute and per-megabyte basis.  Therefore, a general market decline in the price of voice calls and internet capacity may adversely affect the fees we charge our members in order to keep or increase the volume of members business and could materially impact our future revenues and profits." (page 10 in the Registration Statement);

      (j)    "Our members may not trade on our exchange...due to, among other things, the lack of a liquid market, which may materially harm our business.  Volatility in trading volumes may have a significant adverse effect on our business, financial condition and operating results."  (page 11 in the Registration Statement);

      (k)    "Our settlement procedures subject us to financial risk on all receivables not accepted by GMAC or Highbridge...or covered by our other methods of managing credit risk...We seek to mitigate [risk of nonacceptance by GMAC or Highbridge] by evaluating the creditworthiness of each buyer prior to its joining our exchange, as well as requiring either deposits, letters of credit or prepayments from our buyers...In the third quarter of 2004, approximately 98% of our trading revenues were covered by GMAC and Highbridge credit lines netting, prepayments or other cash collateral, of which 46% were covered by GMAC and Highbridge credit lines.  However, our credit evaluations cannot fully determine whether buyers can or will pay us for capacity they purchase through our

exchange...If buyers fail to pay us for any reason and we have not been able or have elected not to secure credit risk protection with respect to these buyers, our business could be adversely affected.  In the event that the creditworthiness of our buyers deteriorates, our credit providers and we may elect not to extend credit and consequently we may forego potential revenues that could materially affect our results of operations." (pages 12, 44 - 45 in the Registration Statement);

(l)     increases in trading revenues from period to period were due to both an increase in volume traded by our members and an increase in the number of members trading on our exchange...fee revenues increased primarily as a result of increases in trading revenues;  (pages 38 - 40 in the Registration Statement);

(m)     "*Shift to Wireless.*  According to Ovum [a leading research organization for telecommunication, software and information technology services], the number of global wireless phones will surpass global wireline phones for the first time in 2004.  Ovum estimates that through 2007, wireless voice traffic will increase by 55% compared to 6% for wireline voice traffic.  By 2007, wireless traffic will account for over 30% of global voice traffic.  In may countries, the per minute cost of a wireless call is up to ten times higher than the per minute cost of a wireline call.  According to Ovum, in 2003 revenues of wireless carriers accounted for approximately 43% of the world's telecommunications revenues on only 25% of the world's calling minutes."  (page 48 in the Registration Statement);

(n)     "When a member trades above the allotted trading volume associated with its minimum, the member then pays an incremental per minute or per mega-byte fee on ll traffic above the minimum usage." (page 56 in the Registration Statement);and

(o)     "Members.  Our members include eight of the world's ten largest international communications services providers.  Our members traded approximately 2.1 billion minutes in the third quarter of 2003 and approximately 2.7 billion minutes in the third

quarter of 2004... No member in 2003 represented over 6% of our revenue and our top ten members represented, in the aggregate, approximately 30% of our revenue...  As of September 30, 2004, approximately 52% of our members were located in North America, 31% were located in Europe and 17% were located in other regions of the world including Asia." (page 56 in the Registration Statement).

32.    On January 26, 2005, defendant Blair initiated its coverage of Arbinet with and outperform rating and company profile of aggressive growth.

33.    On February 17, 2005 Arbinet reported it financial results for the fourth quarter and full year 2004.  Defendant Hockemeier touted the reported results, the increase in members to 360, the increase in minutes volume, and provided a "Business Outlook" for the full year 2005 fee revenues within the range of $58 million to $64 million and net income for that period within the range of $19 million to $23 million.

34.    On or about March 15, 2005, Arbinet filed with the SEC a Form 10-K for the fiscal year ended December 31, 2004.  In the 10-K, the Company stated that as of December 31, 2004, Arbinet had 360 members who subscribe to its voice trading services, including nine of the world's ten largest communications service providers.  The Company reported that fee revenue attributable to domestic operations for the year ended 2004 was $31.5 million, an increase over the prior year's fee revenue of $25.9 million.  Arbinet's members traded approximately 10.5 billion minutes in 2004, an increase over the prior year's trading of 8.0 billion minutes. No member in 2004 represented over 5% of Arbinet's revenue and its top ten members represented, in the aggregate, approximately 29% of Arbinet's revenue.

35.    On April 8, 2005, defendant Merrill upgraded Arbinet to a buy.  Merrill's upgrade was based on the recent weak share price.  Merrill reiterated its Arbinet forecast for first quarter pro forma earnings of $0.12 per share on revenue of $13.4 million.  Merrill's analyst Gregory Smith said that "since launching coverage, the only potential negative data

point that we have come across is an increase in pricing pressure for international long distance minutes.  In the short term, this could be a negative if Arbinet's pricing is perceived as too high....  On the other hand, we think this is a long term positive as it should force more carriers to focus on outsourcing their back office operations related to buying and selling minutes, which could benefit Arbinet."

36.     On May 4, 2005 Arbinet announced its results for the first quarter of 2005, the three months ended march 31, 2005.  Rather than reporting growth in line with the February 17, 2005 Business Outlook, Arbinet reported that its results were "flat" compared to the fourth quarter of 2004.  Defendant Hockemeier attempted to dispel any notion of fundamental problems with Arbinet's business or financial prospects, stating that "Arbinet's growth has historically occurred in step functions as market supply and demand adjust.  Our first quarter results were flat compared to the fourth quarter, but our fourth quarter results were at the high end of our historical quarterly growth rates....  Over the past three years our quarter-to-quarter minutes growth has varied based on the liquidity in the exchange and our long-term growth has remained strong."  Arbinet touted the record trading volume experienced in March 2005 and reaffirmed its 2005 outlook for 2005 fee revenues and net income, as stated on February 17, 2005.

37.     Suddenly, however, on June 21, 2005, Arbinet publicly lowered its Business Outlook for 2005 and forecast greatly reduced results for the second quarter of 2005, the three months ending June 30, 2005.  Arbinet finally owned up to the true material facts that drive its business, fee revenues and profits which had theretofore been omitted and misstated by defendants as alleged above.  In its press release, Arbinet stated:

> Specifically, Arbinet has experienced a shift in the mix of geographic markets traded by its members.  During the same period, there was an increase in the mobile traffic minutes traded on Arbinet's exchange.  Traffic to some markets, like Mexico as an example, is characterized by long average call durations and ranges from twelve to nineteen minutes per call.    This contrasts with the relatively shorter length of mobile calls, which frequently average fewer than three minutes per call. The combination of the shirt in the traffic mix and increase in mobile minutes has lead to a decrease in the

average number of minutes per call transacted on Arbinet's exchange.  As a result of the shift to shorter calls, minutes growth did not keep pace with the 30% growth in completed calls Arbinet experienced in the period January through May 2005 compared with the same period of 2004.  In addition, in May, two large buyers reduced their trading after their credit lines were suspended by Arbinet.

Curt Hockemeier, President and Chief Executive Officer of Arbinet commented, "While we are pleased that Arbinet achieved a record for average daily completed calls in April and May 2005, the average number of minutes per call transacted on the exchange declined due to a change in the mix of geographic markets traded and an increase in mobile traffic minutes traded by members.  Our exchange is a spot market and fluctuates with geographic shifts as certain regions are characterized by longer call durations than other regions.  When there is a shift in the geographic mix it can have a sudden effect on the average number of minutes per call transacted.  With regard to mobile traffic, this has been one of the fastest growing communications segments worldwide for the past few years. This is a primary focus for Arbinet and our exchange members.  From a trend standpoint, mobile calls transacted are typically higher in volumes with shorter call durations.  The record call volumes we achieved in April and May reflect this trend and Arbinet's increasing penetration of this segment."

38.    In the aftermath of the June 21, 2005 disclosures, the price of Arbinet's common stock fell by more than 20%.  Coupled with the drop in Arbinet's common stock price following the May 4, 2005, press release, Arbinet's common stock tumbled more than 50% on the disclosures of the material facts previously withheld or misrepresented.

39.    In its report dated June 30, 2005, defendant Cowen took great issue with Arbinet's explanations of the truth, stating:

While we accept management's explanation of the shortfall, we interpret it slightly differently.  Arbinet competes broadly in the market for wholesale international minutes, a market which is growing steadily.  We believe that if Arbinet is growing more slowly, it is a result of Arbinet not having the lowest cost termination rates to a number of calling destinations.  The pattern of calling is not changing abruptly, as Arbinet implied.  Instead other carriers are capturing the traffic.  For some reason Arbinet is less competitive on routes where it was previously receiving traffic.  We do not understand what specific factors are leading Arbinet to lose share on those routes.

* * *

Our recent research on an Arbinet competitor, iBasis, suggests that ARBX's model for providing wholesale capacity is not as differentiates as we thought.

16

40.     Defendant Blair expressed similar conclusions in its June 29, 2005 report, stating:

> We believe there is an increasing number of unpredictable variables affecting the economics of the business.  During the first quarter 2005, the company cited a supply issue–meaning lack of liquidity on the exchange.  We learned the company offered incentives to sellers resulting in lower net revenue.  During the second quarter, management cited several new factors surrounding weakening revenue.  While the number of average daily completed calls on the exchange is rising, the number of average minutes per call is declining.  The result is lower-than-expected average daily trading minutes.  Arbinet's fees are determined by the number of minutes.
>
> * * *
>
> we question why the revised high end of guidance (revenue of $50 million) is well below previous revenue guidance ($58 million-$64 million)–considering the primary reason for the shortfall is lower [average call duration].  The loss of two buyers represents just 2% - 4% of the 18% variance between $50 million and $61 million (midpoint of previous revenue guidance).

## COUNT I

### Against All Defendants
### for Violation of Section 11 of the Securities Act

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is asserted against Arbinet, the Underwriter Defendants, and the Individual Defendants for violations of  Section 11 of the Securities Act, 15 U.S.C. §77k.

42.     Plaintiff and the members of the Class purchased Arbinet common stock issued pursuant to the Registration Statement filed by the Company with the SEC and declared effective by the SEC on December 16, 2004.

43.     Each of the Defendants named herein is liable because the Registration Statement/Prospectus was materially false and misleading; contained untrue statements of material fact; omitted to state material facts necessary to make the statements made in the registration statement, under the circumstances in which they were made, not misleading; and failed to disclose material facts.

17

44.     The Company is the registrant for the IPO and filed the Registration Statement.  Arbinet is the "issuer" of the common stock sold in the IPO as defined in Section 11(a)(5) of the Securities Act.  As the issuer, Arbinet is liable to Plaintiff and the members of the Class for the misstatements in, and the omissions from, the Registration Statement.

45.     The Individual Defendants signed the Registration Statement and otherwise caused it to be prepared, filed with the SEC, and circulated to the public.  Each of the Individual Defendants is liable to Plaintiff and the members of the Class as a "person who signed the registration statement" as defined in Section 11(a)(1) of the Securities Act.

46.     The Individual Defendants were directors and/or officers of Arbinet when the Registration Statement became effective.  Each of the Individual Defendants is liable to Plaintiff and the members of the Class as a "director" as defined in Section 11(a)(2) of the Securities Act.

47.     The Underwriter Defendants issued, caused to be issued, and participated in the issuance of the materially false and misleading Registration Statement.  Each of the Underwriter Defendants acted as "underwriters" for the IPO, as that term is defined in Section 11(a)(5) of the Securities Act.

48.     The Underwriter Defendants owed to the purchasers of Arbinet stock in the Offering, including Plaintiff and members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement, including the Prospectus, at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

49.     Each of the Individual Defendants and the Company owed to the purchasers of Arbinet stock in the Offering, including Plaintiff and members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the

18

Registration Statement, including the Prospectus, at the time it became effective. This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the Registration Statement/Prospectus not misleading.

50. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements described above, which were contained in the Registration Statement, were accurate and complete in all material respects.

51. At the time Plaintiff purchased Arbinet common stock in the IPO, it did not know nor did any member of the Class know, or by the reasonable exercise of care could have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

52. Plaintiff and the members of the Class purchased Arbinet common stock prior to the date the Company made generally available to its securities holders, an earnings statement covering a period of at least 12 months beginning after the effective date of the Registration Statement.

53. In connection with the IPO and sale of the common stock, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States mail.

54. This action was brought within one year after the discovery of the untrue statements and omissions and within three years after the common stock was sold to the public in the IPO.

55. By reason of the foregoing, Defendants violated Section 11 of the Securities Act and are liable to Plaintiff and the members of the Class, each of whom has been damaged by reason of such violations.

19

**COUNT II**

**Against the Individual Defendants
for Violations of §15 of the Securities Act**

56.     Plaintiff repeats and realleges each and every allegation contained above as fully set forth herein.

57.     The Individual Defendants were controlling persons of Arbinet within the meaning of Section 15 of the Securities Act by virtue of their positions as senior officers and directors of Arbinet and their power to control Arbinet's corporate actions and the transactions alleged herein, which give rise to Arbinet's liability under the securities laws. In particular, the Individual Defendants directly controlled the contents and the issuance of the false and misleading Registration Statement/Prospectus.

58.     None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement/Prospectus for the IPO were true and devoid of any omissions of material fact.  Therefore, by reason of their status as controlling persons of the Company, as alleged herein, pursuant to Section 15 of the Securities Act, each of these Defendants is liable jointly and severally with and to the same extent that Arbinet is liable to Plaintiff and the members of the Class as a result of the wrongful conduct alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff on his own behalf, and on behalf of the other members of the Class, pray for judgment as follows:

A.     Declaring this action to be a proper class action, certifying plaintiff as the Class representative and its counsel as Class counsel;

B.     Declaring and determining that the Defendants violated the federal securities laws by reason of their conduct as alleged herein;

C.     Awarding money damages against the Defendants, jointly and severally, in favor of the Plaintiff and the other members of the Class for all losses and injuries suffered

20

as a result of the acts and transactions complained of herein, together with pre-judgement interest on all of the aforesaid damages which the Court shall award from the date of said wrongs to the date of judgment herein at a rate the Court shall fix;

       D.      Awarding Plaintiff its costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

       E.      Awarding such other relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: September 2, 2005          **LAW OFFICES BERNARD M. GROSS, P.C.**

                                      **/s/ Tina Moukoulis**
                                      Tina Moukoulis (TM-02698)
Deborah R. Gross *(admitted pro hac vice)*
Suite 450, Wanamaker Building
Juniper and Market Streets
Philadelphia, PA 19107
Telephone: (215) 561-3600

LERACH COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
MARY K. BLASY
401 B Street, Suite 1600
San Diego, CA  92101-4297
Telephone:  619/231-1058
619/231-7423 (fax)
LERACH COUGHLIN STOIA GELLER

      RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

**Counsel for Plaintiff**

21