**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                          :
IN RE ARBINET-THEXCHANGE, INC.            :
SECURITIES LITIGATION                     :        CIVIL ACTION NO. 05-4404 (JLL)
                                          :
_____:          **OPINION**

**LINARES**, District Judge.

   Lead Plaintiff, Sandra Schwartz and Plaintiff, Louisiana School Employees' Retirement

System ("LSERS") (collectively, "Plaintiffs") filed a Consolidated Amended Class Action

Complaint[1] against Defendants, Arbinet-thexchange, Inc. ("Arbinet"); J. Curt Hockemeier; John

J. Roberts; Anthony L. Craig; William G. Kingsley; Mathew J. Lori; Roland A. Van der Meer

(collectively, the "Individual Defendants"); and Merrill Lynch & Co., Inc.; Lehman Brothers; SG

Cowen & Co.; William Blair & Co., LLC; and Advanced Equities Inc. (collectively, the

"Underwriter Defendants").[2]  Plaintiffs allege violations of sections 11, 12, and 15 of the

Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l, and 77o.

   Defendants have filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P.

12(b)(6).  For the following reasons, the Court grants Defendants' motion and dismisses the

complaint.[3]

_____

   [1]  The Consolidated Amended Class Action Complaint, filed on February 17, 2006, will
be referred to in this opinion as the "complaint."

   [2]  Although Plaintiffs bring this action as a class action, the Court has not yet certified a
class in this matter.

   [3]  The Court decides this matter without oral argument.  Fed. R. Civ. P. 78.  Jurisdiction
is premised on section 22 of the Securities Act, 15 U.S.C. § 77v, and venue is premised on 28
U.S.C. § 1391(b).

I.    **Factual and Procedural History**[4]

Arbinet operates an electronic exchange which allows telecommunications carriers to buy, sell, and trade voice and data capacity using Arbinet's web-based marketplace.  The exchange matches buyers with sellers, who trade anonymously, based on the attributes of the voice minutes or data capacity that they wish to buy or sell.  The exchange then completes the transaction and routes the voice call or data stream through Arbinet's telecommunications traffic facilities.  Arbinet earns revenues by charging fees to the carriers that use its exchange.   Fees are primarily calculated based on the total volume of voice calls and data transmissions traded on the exchange (i.e., number of voice call minutes or megabytes of data).

In the fourth quarter of 2004, ending December 31, 2004, Arbinet had its best quarter ever in terms of revenues, earnings per share, and total minutes traded on the exchange.  This was the first quarter in Arbinet's history in which total minutes traded on the exchange reached three billion minutes.  Revenues were 12% higher than the previous quarter.

On December 16, 2004, two weeks before the close of the fourth quarter of 2004, Arbinet conducted an initial public offering ("IPO") and offered 6.5 million shares of common stock at $17.50 per share.  This 6.5 million shares consisted of 4.23 million shares sold by Arbinet and 2.3 million shares sold by unspecified selling stockholders.  The IPO generated net proceeds of $68.9 million for Arbinet and $37.4 million for the selling stockholders.

---

[4]  For purposes of the instant motion to dismiss, the Court accepts Plaintiffs' factual allegations as true.   The Court relies on the operative complaint, as well as the exhibits attached to the complaint, copies of documents referred to in the complaint, and public filings submitted by the parties in crafting this factual and procedural history.  See, e.g., Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  Plaintiffs did not object to such consideration.

In accordance with the IPO, Arbinet issued a Registration Statement and Prospectus (the "Offering Materials") detailing, among other things, historical facts about Arbinet, company goals, and the risks inherent in investing in Arbinet.  In particular, Arbinet warned investors that the company has "incurred significant losses since its inception" and that investment in Arbinet stock "involves a high degree of risk."  See Offering Materials at 4-5.  Arbinet cautioned that it "may not succeed in these activities and may never generate" significant revenues to sustain profitability.  See id. at 4.  Further, Arbinet warned investors that carriers may, for a variety of reasons, choose to withdraw from the exchange or decide not to use the exchange.  See id. at 11. Arbinet also stated that a decline in usage of the exchange and volatility in trading volumes may have a significant adverse effect on Arbinet due to its fee structure.  See id. at 11.

Lead Plaintiff Schwartz alleges that she purchased shares of Arbinet common stock "pursuant or traceable to the IPO."  Plaintiff LSERS alleges that it purchased shares of Arbinet common stock in the IPO and additional shares traceable to the IPO.

Defendants Hockemeier, Roberts, Craig, Kingsley, Lori, and Van der Meer are alleged to be current or former directors and officers of Arbinet.  Plaintiffs claim that these Individual Defendants signed the IPO Registration Statement.  The Underwriter Defendants, as identified above, are the banking firms that allegedly helped plan and launch the IPO.

In February 2005, two months after the IPO, Arbinet publicly forecasted the revenues and earnings it thought it would achieve for the 2005 fiscal year ending December 31, 2005.  The projected annual net income was listed as $19-23 million.

On May 4, 2005, approximately five months after the IPO, Arbinet announced "flat results" for the first quarter of 2005.  Thereafter, on June 21, 2005, Arbinet revised its revenue

forecast for the 2005 fiscal year from $19-23 million in annual net income to $3-6 million.  In a press release announcing the revision, Arbinet attributed this revised revenue forecast to a change in the mix of geographic markets and sudden increase in mobile traffic minutes traded on the exchange within the previous six weeks.  Because wireless calls are generally shorter in duration than land-line calls, the increase in wireless calling led to a decrease in the average number of minutes traded on the exchange which resulted in lower revenues.  In purported response to this information, on June 22, 2005, the Arbinet stock price dropped 35% and decreased by 60% in the following weeks.

On February 16, 2006, Arbinet reported its financial results for the 2005 fiscal year and the quarter ending December 31, 2005.  This report indicated that fee revenues for the fourth quarter of 2005, namely, $12 million, were down 4% from the same quarter of 2004, which revenues were $12.5 million.  In a press release issued on the same day reporting these financial results, Arbinet stated that while the total number of minutes traded on the exchange declined from 3.0 billion minutes traded in the fourth quarter of 2004 to 2.92 billion minutes traded in the fourth quarter of 2005, the total number of calls traded increased from 346.7 million in the fourth quarter of 2004 to 352.3 million in the fourth quarter of 2005.  The average call duration on the exchange declined from 4.3 minutes per call in the fourth quarter of 2004 to 4.1 minutes per call in the comparable quarter in 2005.

Plaintiffs now seek to link the drop in stock price, precipitated by the revised revenue projections, to material omissions in the Offering Materials.  In doing so, Plaintiffs argue that "in the weeks and months preceding the IPO," Arbinet knew of various adverse trends that could have a future impact on the company's revenues, and Arbinet failed to disclose such trends and

4

their potential effects in the Offering Materials.[5]  In particular, Plaintiffs claim that Arbinet failed

to disclose that:

(1)     an increase in wireless calling resulted in a decrease in the duration of the calls
        traded on the exchange, negatively impacting Arbinet's revenues and threatening
        its future success;

(2)     Arbinet's interface was not compatible with carriers' internal trading and routing
        systems, resulting in customer dissatisfaction and decreased usage of the
        exchange;[6]

(3)     Arbinet's customers did not like the anonymous nature if its exchange, resulting

_____

[5]  The Court dismisses Plaintiffs' claims that these trends had a materially adverse impact
on Arbinet's financial performance prior to the IPO.  These claims are clearly contradicted by the
financial documents referenced in Plaintiffs' complaint and submitted by the parties which show
that at the time of the IPO, Arbinet was experiencing its strongest financial quarter ever.
Plaintiffs admit that they do not question the accuracy of these financial results and do not object
to the Court's consideration of these documents in resolving the instant motion.  See Plaintiffs'
Brief at 15 ("Plaintiffs do not contest the accuracy of the Company's financial results.").  Such
claims are thus dismissed.  See, e.g., In re PDI Sec. Litig., No. Civ. A. 02-0211, 2005 WL
2009892, at *21 (D.N.J. Aug. 17, 2005) ("When allegations contained in a complaint are
contradicted by the document it cites, the document controls."); Gart v. Electroscope, Inc., 24 F.
Supp. 2d 969, 972 (D. Minn. 1998) (holding that company did not have a duty to disclose
purported downward trend in revenues where documents indicated that there was no such trend
in revenues).

Plaintiffs' claim, brought for the first time in their opposition brief to the instant motion,
that Arbinet's revenues at the time of the IPO would have been higher but for the existence of
these trends, see Plaintiffs' Opposition at 14-17, will not be considered because it is not pled in
the complaint.  See, e.g., Commw. of Pa. ex. rel Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 181
(3d Cir. 1988) (" 'It is axiomatic that the complaint may not be amended by the briefs in
opposition to a motion to dismiss.' " (quotation omitted)).  Even if the Court were to consider
this claim, Plaintiffs fail to plead any facts to support this bald, speculative assertion.  Thus, the
Court limits its discussion to whether Arbinet should have disclosed that these purported trends
and business conditions could impact the company's future performance.

[6]  It appears that by "compatibility" Plaintiffs refer to carriers' inability to access the
exchange through whatever internal software programs they run on their own computer systems.
See Plaintiffs' Brief at 21 n.6.  Instead, carriers must log on to an internet address on the web to
access the exchange.  As Defendants describe this connection, it is "much the way a consumer
logs on to the eBay website to buy or sell items through the eBay online exchange."  See
Defendants' Brief at 20.

in customer dissatisfaction and decreased usage of the exchange; and

(4)     Arbinet lacked the ability to monitor the quality of calls traded on its exchange, resulting in customer dissatisfaction and decreased usage of the exchange.[7]

According to Plaintiffs, Arbinet's flat results and revised revenue forecast are "manifestations of the same adverse trends and conditions which existed prior to the IPO, but which were not disclosed anywhere in the Offering Materials." See Complaint at ¶ 8.

Plaintiffs allege that all Defendants violated section 11 of the Securities Act, 15 U.S.C. § 77k; the Underwriter Defendants violated section 12 of the Securities Act, 15 U.S.C. § 77l; and the Individual Defendants are liable under section 15 of the Securities Act, 15 U.S.C. § 77o.[8]

## II.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a Rule 12(b)(6) motion to dismiss, the court must reasonably read the complaint and decide whether the

---

[7]  Plaintiffs initially claimed that the exchange's anonymity, integration problems, and Arbinet's inability to monitor call quality also caused customers, and in particular, large carriers, to withdraw from the exchange altogether.  Plaintiffs appear to withdraw this allegation in their opposition brief, framing the effects of these problems solely as "member dissatisfaction and decreased usage of the exchange."  See Plaintiffs' Brief at 2. In fact, Plaintiffs appear to admit that the public filings submitted by Defendants (which show an overall increase in membership and specifically an increase in large carrier membership) contradict their allegations that customers were withdrawing from the exchange.  See id. at 15-16.  Accordingly, they emphasize that the "core" of their allegations is the decreased usage of the exchange.  See id.  Thus, any claims based on customers' withdrawal from the exchange are dismissed.

[8]  Plaintiffs expressly state that they do not bring any claims under, or rely on, Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a).  See Plaintiffs' Brief at 36 ("But, unlike Plaintiffs here, the plaintiff in Oxford based the company's disclosure obligation on Item 303(a)(3)(ii) of Regulation S-K.).  This regulation mandates disclosure of certain known trends that have had or that a registrant reasonably expects to have a material effect on the company's performance.  See 17 C.F.R. § 229.303(a).

plaintiff has pled a cognizable cause of action entitling her to relief.  Nami v. Fauver, 82 F.3d 63,

65 (3d Cir. 1996).  In making this determination, a court accepts as true all of the well-pleaded

factual allegations within the complaint and any reasonable inferences drawn therefrom.  See id.

at 65; Hayes v. Gross, 982 F.2d 104, 105-06 (3d Cir. 1992).  However, the court need not

consider a plaintiff's bald assertions or legal conclusions.  See, e.g., Morse v. Lower Merion

School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

## III.   Legal Discussion

Plaintiffs bring claims under sections 11, 12, and 15 of the Securities Act.  The Securities

Act regulates the initial distribution of securities.  See Gustafson v. Alloyd Co., Inc., 513 U.S.

561, 571-72 (1995).  Pursuant to section 11, certain enumerated persons may be held liable for

material misstatements and omissions found in a registration statement.  See 15 U.S.C. § 77k(a).

In particular, liability may be imposed upon persons who signed the registration statement,

current and in certain instances future directors of the company, and the offering underwriters.

See id. § 77k(a)(1)-(5).  Section 12 imposes liability for material misstatements or omissions in a

prospectus on those who offer or sell a security, such as the underwriters.  See 15 U.S.C. § 77l.

Persons who control others who engage in a primary violation of the federal securities laws are

subject to liability under section 15.  See 15 U.S.C. § 77o.

Liability under sections 11 and 12 of the Securities Act are imposed in essentially the

same instances.  Pursuant to section 11, an appropriate defendant is liable where the registration

statement (1) contains an untrue statement of a material fact; (2) omitted to state a material fact

required to be stated therein; or (3) omitted to state a material fact necessary to make the

statements therein not misleading.  See 15 U.S.C. § 77k(a).  Section 12(a)(2) provides for

liability where a prospectus either contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein not misleading.  15 U.S.C. § 77l(a)(2).

To establish a section 11 and section 12 claim, the plaintiff must plead facts to demonstrate that the allegedly omitted facts existed and were either *known or knowable* at the time of the offering.  See Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc., 114 F. Supp. 2d 318, 323 (D.N.J. 2000); Zucker v. Quasha, 891 F. Supp. 1010, 1017 (D.N.J. 1995).[9]   This is because the court must evaluate whether the statement or omission was misleading *at the time it was made*.  See, e.g., Zucker, 891 F. Supp. at 1014.

Further, the plaintiff must show that the misstatement at issue was material.  The company, however, does not have a duty to provide the public with all information material to the offering.  See In re Burlington Coat Factory, 114 F.3d at 1432; see also Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1190 (11th Cir. 2002).  Thus, the "possession of material nonpublic information alone does not create a duty to disclose it."  See, e.g., In re Burlington Coat Factory, 114 F.3d at 1432.  Accordingly, to the extent that the plaintiff bases her claims on omissions, she must demonstrate that the defendant had a duty to disclose the information in the first place.  See, e.g., In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 277 (3d Cir. 2004).  As indicated above, the defendant's duty to disclose arises where the omission is required to be stated by law or where such is "necessary to make the statements therein not misleading."  See, e.g., In re Adams Golf, 381 F.3d at 277; Oxford Asset Mgmt., 297 F.3d at 1190.

_____

[9]  However, the plaintiff need not plead fraud, reliance, or scienter.  See, e.g., In re Mobilemedia Sec. Litig., 28 F. Supp. 2d 901, 923 (D.N.J. 1998).  Further, because Plaintiffs' claims do not sound in fraud, they need not plead with the particularity required by Fed. R. Civ. P. 9(b).  See, e.g., In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006).

Plaintiffs do not allege that any particular statement in Arbinet's registration statement or prospectus is itself an untrue statement of material fact. Their claims are phrased as omissions — the failure to disclose the effects of the increase in wireless calling; the failure to disclose the incompatibility problems with Arbinet's interface; the failure to disclose the fact that customers did not like the anonymous nature of the exchange; and the failure to disclose that Arbinet was unable to monitor call quality. Plaintiffs do not claim that any of these omissions were required to be stated by statute, regulation, or other law. Therefore, their claims can only be premised on the argument that Arbinet's omission of this information made the statements in the Offering Materials identified by Plaintiffs misleading.

Defendants do not appear to challenge the materiality of the purported omissions at this stage of the litigation. Instead, Defendants claim that Plaintiffs have not shown that Arbinet had a duty to disclose this omitted information because such omissions did not make any of the existing statements in the Offering Materials misleading. The Court will consider below whether Arbinet had a duty to disclose the purported omissions.

**A.      Wireless Calling**

Plaintiffs admit that Arbinet readily disclosed a growing trend towards wireless calling, as opposed to land-line calling. See Offering Materials at 2, 48. Further, Plaintiffs admit, in their opposition brief, that they are not challenging Arbinet's failure to disclose the fact that wireless calls are historically shorter in duration than land-line calls. See Plaintiffs' Brief at 12 ("Plaintiffs do not complain about the omission of any data about the duration of wireless calls."). Plaintiffs concede that the average length of wireless calls is public information, and thus, not subject to a duty to disclose. See id. ("the average *length* of wireless calls may have

9

been public, the *effects* on Arbinet were firm-specific"); <u>see</u> <u>also</u> <u>In re Adams Golf</u>, 381 F.3d at

279 (indicating that a company is "not duty-bound to disclose general industry-wide trends easily

discernable from information already available in the public domain").

      Instead, Plaintiffs claim that Defendants violated the securities laws by failing to disclose

the effects of this trend, namely, a decrease in revenues for the company because revenues are

based on the duration of calls traded on the exchange.  <u>See</u> Plaintiffs' Brief at 12 ("Plaintiffs

complain that Defendants failed to disclose the *consequences* of shorter wireless calls for

Arbinet's financial condition and business prospects."), 32 ("The gravamen of Plaintiffs' wireless

calling allegations is not the nondisclosure of the *length* of wireless calls, but, instead, the

nondisclosure of the financial *effects* of shorter wireless calls coupled with increased wireless

calling.").

      According to Defendants, this omission rendered various unspecified references on pages

2 and 48 of the Offering Materials to the "proliferation" of wireless products and services

materially misleading.  It is Plaintiffs' obligation to point out which statements they are referring

to; however, the Court's review reveals that the following statements on pages 2 and 48 deal with

the "proliferation" of wireless calling:

    (1)    "[t]he industry has been experiencing significant changes, including the
          proliferation of wireless and data products and services . . . ." <u>see</u> Offering
          Materials at 2; and

    (2)    "[t]he voice industry is characterized by changes driven by deregulation in
          telecommunications markets around the world, an increase in and shift of
          minutes to wireless . . . ." <u>see</u> <u>id.</u> at 48.

In addition, Plaintiffs allege that the purported omission regarding the effects of the increase in

wireless calling rendered the following statements materially misleading:

> "the number of global wireless phones will surpass global wireline phones for the first time in 2004" and "through 2007, wireless voice traffic will increase by 53% compared to 6% for wireline voice traffic."

<u>See</u> Offering Materials at 48.

Arbinet's failure to disclose the purported effects of the increase in wireless calling is not actionable. None of the statements identified by Plaintiffs were rendered misleading by Arbinet's failure to disclose that an increase in wireless calling could result in more shorter-duration phone calls and thus, less revenues for Arbinet. All Arbinet represented in these statements was that wireless calling was on the rise and was expected to increase substantially when compared to land-line calling. Arbinet never represented that this increase would produce more revenues for Arbinet. Arbinet also did not speculate that total voice minutes traded would increase or even stay the same after the IPO. Instead, Arbinet warned that declines in trading volume may occur which "would result in lower revenues to us" and that revenue volatility could negatively affect Arbinet's financial performance. <u>See</u> Offering Materials at 11.

Further, the securities laws do not require companies to "state the obvious." <u>See, e.g.</u>, <u>Klein v. General Nutrition Co., Inc.</u>, 186 F.3d 338, 343 (3d Cir. 1999); <u>In re Numerex Corp. Sec. Litig.</u>, 913 F. Supp. 391, 400 (E.D. Pa. 1996). Arbinet fully disclosed that its revenues were primarily based on the number of voice minutes and megabytes of data traded. Thus, a reasonable investor would understand, based on the information disclosed in the Offering Materials as well as the admittedly public information on the average duration of wireless calls, that an increase in wireless calling could lead to a decrease in Arbinet's revenues.

Additionally, the premise that an increase in shorter-duration phone calls results in a loss

of revenues is fundamentally flawed.  Arbinet's revenues are driven by the total number of

minutes traded on its exchange, not the nature of the calls making up those minutes.  If minutes

traded grow, revenues will grow, regardless of the relative percentages of wireless and land-line

calls.  Thus, an increase in wireless calling could result in more total calls, consisting of more

total minutes, resulting in greater revenues.  Further, data megabytes are also traded on the

exchange, a variable that is independent of voice minutes traded.  Thus, the effects of this

purported adverse trend are speculative and disclosure of such is not mandated.  See In re

Craftmatic Sec. Litig., 890 F.2d 628, 644 (3d Cir. 1990) (stating that company was not liable

under the securities laws for failing to make speculative prediction).

Accordingly, Plaintiffs' claim that Defendants failed to disclose the effects of an increase

in wireless calling is dismissed.

**B.      Incompatibility of Interface**

Plaintiffs allege that Arbinet failed to disclose that Arbinet's exchange interface was

incompatible with the in-house networks of its major telecommunications customers, thus

resulting in customer dissatisfaction and a decline in usage of the exchange.  In particular,

Plaintiffs claim that Arbinet's largest customers faced such compatibility problems because they

had well-established in-house networks, thus leaving only minor, unestablished

telecommunications carriers, which do not account for a meaningful volume of trading, to trade

on Arbinet's exchange.

Plaintiffs claim that Arbinet's omission of the integration problems rendered the

following statements materially misleading:

(1)      "[We believe that] we provide a cost-effective and efficient alternative" to more

traditional telecommunications trading mechanisms, <u>see</u> Offering Materials at 1, 32, and 47;[10]

(2)     the exchange "replaces the lengthy, costly, and highly negotiated process of searching for and interconnecting to other communications services providers on a one-to-one basis and managing each interconnection on an ongoing basis," <u>see</u> <u>id.</u> at 3, 51;

(3)     "We have created a global market where our members, through a single interconnection to our facilities, trade, route and settle voice calls and Internet capacity.  Our exchange is neutral, favoring neither buyer nor seller, and allows our members to trade anonymously.  Our system incorporates the following processes and attributes . . . .

Our members place orders based on quality and price criteria, through our easy-to-use, web-based trading platform.  We independently monitor and update the route quality rating of our sellers. . . .

Our proprietary software and patented processes automatically match and prioritize the orders based on the quality and price parameters that our members place on our exchange," <u>see</u> <u>id.</u> at 2;

(4)     "Our exchange provides many benefits to our members.  By trading, routing and settling voice calls and Internet capacity through our exchange, members can access multiple buyers and sellers, increase network utilization, achieve better pricing and improve profitability and cash flow by reducing the number of interconnections, reducing selling, legal, billing and collection expenses and eliminating disputes and bad debt.

*Benefits of a single interconnection*.  By establishing a single interconnection to one of our five exchange deliver points . . . communications services providers gain immediate targeted access to and a link with several hundred buyers and sellers.  This replaces the lengthy, costly and highly negotiated process of searching for and interconnecting to other communications services providers on a one-to-one basis and managing each interconnection on an ongoing basis.  Furthermore, by aggregating traffic through a single interconnection to our exchange, we believe that our members can improve their network utilization by increasing the traffic they buy and sell through their existing infrastructure.

*Benefits of our trading platform and automatic routing*.  We believe our buyers

---

[10]  Plaintiffs failed to state that this sentence began with "[w]e believe that".  The Court inserted the beginning of the sentence to provide proper context for its meaning.

are able to lower their costs at their specified quality criteria for voice calls and Internet capacity because buyers have access to quality and price data of numerous sellers," <u>see id.</u> at 3.

None of these statements are rendered misleading by the omission of the purported problems carriers faced in integrating the Arbinet exchange with their existing infrastructures. The first representation, that the company *believes* that it "provides a cost-effective and efficient alternative to more traditional telecommunications trading mechanisms" is the type of vague statement of management opinion and optimism that is not actionable under the securities laws. <u>See, e.g.</u>, <u>In re Burlington Coat Factory</u>, 114 F.3d at 1427. The remaining representations generally describe the workings of the exchange — carriers gain access to buyers and sellers by making a single interconnection to Arbinet's exchange as opposed to having to interconnect to and deal with each buyer and seller independently.

None of these statements represent or even imply that Arbinet's interface was compatible with all carriers' interfaces or that such compatibility would be achieved. Plaintiffs' assertions to the contrary are misguided and based on an unreasonable interpretation of the language in the Offering Materials. Plaintiffs have identified no statement in the Offering Materials where Defendants "represent that Arbinet's exchange takes the place of carriers' existing infrastructures," <u>see</u> Plaintiffs' Brief at 22.

The only identified reference to the carriers' internal infrastructures appears on page 3 of the Offering Materials. Plaintiffs claim that Defendants represent that carriers can "use the exchange to "buy and sell through their existing infrastructures." <u>See</u> Plaintiffs' Brief at 22. However, Plaintiffs fail to emphasize the entire context of this statement which reads: "by aggregating traffic through a single interconnection to our exchange, we believe that our

14

members can improve their network utilization by increasing the traffic they buy and sell through their existing infrastructure.' " See Offering Materials at 3.  This is not a representation that Arbinet's exchange was compatible with carriers' internal infrastructures.  Plaintiffs fail to explain how this representation, taken in context, is rendered misleading by Arbinet's failure to disclose that some carriers' interfaces were not be compatible with Arbinet's exchange.

In addition, Plaintiffs have provided no specific facts to show that any such integration problems were known or knowable at the time of the IPO.  The Court rejects Plaintiffs' assertion that Arbinet validated the existence and severity of integration problems, prior to the IPO, by the following statement made by Defendant Hockemeier in a February 16, 2006 investor conference call:

> we are working on a solution to enable our members to utilize our platform to manage direct, one-to-one commercial relationships.  We have learned that our members wish to maintain direct, commercial relationships with certain carriers that have attractive supply or demand.

First, this passage does not demonstrate that integration problems, as Plaintiffs have described them, existed.  Even assuming that Hockemeier's statement revealed the existence of integration problems, such does not demonstrate that these problems and their effects were known or knowable at the time of the IPO.  Plaintiffs merely ask the Court to draw that inference based on subsequent events, namely Hockemeier's February 16, 2006 statement and the post-IPO revision of Arbinet's revenue forecast.  This is not permissible.  See Zucker, 891 F. Supp. at 1016-18 (dismissing section 11 and 12 claims based on failure to disclose precarious financial condition of companies issuer was investing in where plaintiff failed to allege any fact to demonstrate that such companies were in a precarious financial condition when the offering materials became effective and instead, asked the court to draw an inference of existence based on companies'

subsequent bankruptcies).

Thus, Plaintiffs' claim for failure to disclose purported integration and incompatibility problems with Arbinet's interface is dismissed.[11]

## C.   Anonymity

Plaintiffs allege that while Arbinet touted the anonymous nature of the exchange as "boosting call quality", see Plaintiffs' Brief at 31, it failed to disclose that anonymous trading was undesirable to many carriers, especially the larger carriers, because it interfered with their efforts to achieve route diversity, transmission quality, and reliability.  Thus, customers trading on the exchange would not be able to ensure that they were dealing with a reliable and reputable high-grade carrier.  Plaintiffs claim that this condition resulted in a decline in usage of the exchange.  Plaintiffs assert that the following statements were rendered materially misleading by Defendants' omission:

(1)     "Sales on our exchange are made on an anonymous basis thereby preserving the communications services provider's flexibility with respect to pricing, quality, and volume," see Offering Materials at 50; and

(2)     the full-color image on the cover of the Offering Documents noting in prominent text that the exchange is "Neutral and Anonymous."

Plaintiffs also claim that unspecified statements on pages 1, 2, 11, 32, 47, and 60 of the Offering

---

[11]   The Third Circuit's decision in In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267 (3d Cir. 2004) is distinguishable.  In that case, the Third Circuit found that the defendant's omission of the fact (not trend) that discount retailer Costco was selling certain of the company's products was material and that the plaintiff adequately pled that the defendant had a duty to disclose such information.  See In re Adams Golf, 381 F.3d at 277-78.  A duty to disclose was found because the company represented in its offering documents that the company "does not sell its products through price sensitive general discount warehouses."  See id.  Thus, the omission of Costco's sale of the company's product rendered the explicit representation that products are not sold through general discount warehouses materially misleading for purposes of a motion to dismiss. Plaintiffs have not shown such with respect to the purported omissions in this matter.

Materials were rendered misleading by the purported omission.  Again, Plaintiffs fail to identify which statements were misleading or rendered misleading by omissions.  The Court assumes Plaintiffs refer to the following statements:

    (1)      "Members of our exchange . . . anonymously buy and sell voice calls and Internet capacity . . . ." <u>see</u> Offering Materials at 1, 32, 47; and

    (2)      "Our exchange is neutral . . . and allows our members to trade anonymously," <u>see</u> <u>id.</u> at 2.[12]

The Court finds that Defendants purported omission as to large carriers' purported dislike of the anonymous nature of the exchange is not actionable.  None of the statements identified by Plaintiffs (or identified by the Court on Plaintiffs' behalf) touted the anonymous nature of the exchange.  Nowhere does Arbinet represent that customers would like the anonymous nature of the exchange.  Further, Plaintiffs point to no statement in the Offering Materials where Defendants represent, or even imply, that such "boosts call quality."  Arbinet merely disclosed the fact that trading was anonymous and that such provided certain flexibility to carriers.  Thus, none of these statements were rendered misleading by Defendants' purported omission.  Defendants therefore did not have a duty to disclose such information.

Furthermore, Defendants explicitly warned investors that customers may choose to withdraw from or cease using the exchange and that such might materially harm Arbinet's financial performance.  <u>See</u> Offering Materials at 11.

Accordingly, Plaintiffs' claims on this basis are dismissed.

---

[12]  Plaintiffs fail to identify any misleading statements on pages 11 or 60 of the Offering Materials.  No such potential misleading statements were readily discernable by the Court.  Thus, the Court will not consider whether any statements on these pages were rendered misleading by Arbinet's purported failure to disclose that customers did not like the anonymous nature of Arbinet's exchange.

**D.____Monitoring**

Plaintiffs claim that while Arbinet touted its ability to monitor call quality, it failed to disclose that it was unable to independently monitor whether the call qualities and characteristics quoted on the exchange were accurate.  As a result, whenever sellers inputted inaccurate variables that were then quoted on the exchange and relied on by buyers when purchasing, buyers would receive less than what they bargained for.  According to Plaintiffs, this compromised the integrity of the exchange and resulted in customer dissatisfaction and a decrease in usage of the exchange.

Plaintiffs assert that this omission is actionable because Defendants repeatedly stated that Arbinet "was able to—and did, in fact—monitor the characteristics of the voice and data capacity quoted on its exchange, to ensure that buyers were receiving and purchasers were making available, routes of the quality represented."  See Complaint at ¶ 69.  Plaintiffs claim that various unspecified references to Arbinet's monitoring ability at pages 1, 2, 3, 32, 47, and 50 of the Offering Materials contained misleading statements.  Again, Plaintiffs do not identify which statements they refer to.  The Court assumes that Plaintiffs refer to the following statements on such pages:

(1)    "We independently assess the quality of these routes and include that information in the sell order," see Offering Materials at 1, 32, 47;

(2)    "We independently monitor and update the route quality rating of our sellers," see id. at 2;

(3)    "We eliminate the need for buyers to independently assess the quality of each seller's network by providing a centralized and up-to-date source of quality rating of sellers' routes, enabling buyers to make quality comparisons between sellers' routes, see id. at 3; and

(4)     "We independently measure the quality rating of each seller's route and regularly update that rating, see id. at 50;

Plaintiffs do identify the following statement as rendered misleading by Defendants' purported omission:

"We eliminate the need for buyers to independently assess the quality of each seller's network [by providing a centralized and up-to-date source of quality rating of sellers' routes]" since "[o]ur systems automatically measure the seller's route quality based on traffic the seller has received through our exchange."

See id. at 51, 57.[13]

The Court dismisses Plaintiffs' claim based on this purported omission.  First, it appears that all Arbinet represented in the Offering Materials is that Arbinet independently monitors the sellers' route quality.  Defendants do not represent that Arbinet's system monitors any other characteristic of the voice and data capacity traded on its exchange.

Furthermore, to the extent that the Court misunderstands the concept of route quality, as distinct from other characteristics of the voice and data capacity traded, Plaintiffs still offer no specific facts to support their bald assertion that Arbinet was unable to monitor call quality or that any such monitoring problems were known or knowable by Arbinet at the time of the IPO. See, e.g., In re Adams Golf, 381 F.3d at 279 ("the fact that looking backward, one perceives a trend does not necessarily mean that conditions were such that one year earlier the situation was sufficiently obvious or noteworthy"); Oxford Asset Mgmt., 297 F.3d at 1192-93 (dismissing claim that company made misrepresentations in prospectus where plaintiff failed to plead any specific facts to support bald assertions in complaint).

_____

[13]  Plaintiff only set forth portions of this quotation in their complaint.  See Complaint at ¶ 69.  The Court has provided the entire text to illustrate the necessary context for analysis.

Plaintiffs argue that their allegation that buyers "receive[d] materially less than they bargained for" provides the necessary factual support for their assertion. The Court rejects this argument. Two bald assertions do not equal a legally sufficient claim. Just as there are no contemporaneous facts to support the allegation that Arbinet was unable to monitor call quality, there are similarly no contemporaneous facts to establish that unspecified buyers were receiving materially less than they bargained for.

Therefore, Plaintiffs' claim that Defendants failed to disclose Arbinet's inability monitor call quality on the exchange is dismissed.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs' complaint is dismissed. Plaintiff has not alleged any actionable misstatements or omissions pursuant to sections 11 or 12 of the Securities Act. Without alleging a primary violation, Plaintiffs' section 15 claims must also be dismissed. See, e.g., Klein, 186 F.3d at 344 (dismissing section 15 claims where plaintiffs failed to allege a primary violation of section 11 or 12); Castlerock, 114 F. Supp. 2d at 325 (same). The Court accordingly need not reach the issue of whether Lead Plaintiff Schwartz, who purchased shares in the aftermarket of the IPO, has standing to pursue a section 12(a)(2) claim.

To the extent that any of these claims can be amended to comply with the Federal Rules of Civil Procedure, Plaintiffs have thirty (30) days from the entry of this order to file such an amended complaint. Plaintiffs' failure to do so will result in a dismissal of the aforementioned claims with prejudice.

Date:   December 22, 2006                              /s/ Jose L. Linares
_____ United States District Judge